2024 IL App (1st) 230859-U

SIXTH DIVISION
November 8, 2024

No. 1-23-0859

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| DT&C GLOBAL MANAGEMENT, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 20 CH 5468 |
| | ) | |
| CROWN CARS AND LIMOUSINES, INC., *et al*., | ) | The Honorable |
| | ) | Sandra Ramos, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justice Gamrath concurred in the judgment.
Justice Hyman, specially concurred.

**ORDER**

¶ 1    Held:  We reverse the circuit court's decision to bar plaintiff's expert witness on unjust enrichment damages and remand for a new trial limited to damages. We affirm the jury verdict on the conversion count and the circuit court's dismissal of the individual defendants from that count.

¶ 2                                 I. BACKGROUND

¶ 3    John Jansen was the founder and principal owner of Plaintiff DT&C Global Management,

LLC (DT&C), a limousine company that grew to become one of the largest in the Chicagoland

area. DT&C's clients were primarily large corporations and wealthy individuals. Limousine

services were provided under the business trade names Town & Country Limousine (Town & Country), Delaware Cars & Limousines (Delaware), and Mirage Limousines (Mirage). In 2013, Jansen consolidated the three businesses into DT&C.

¶ 4    In 2020, DT&C brought suit against Crown Cars and Limousines, Inc. (Crown), and its principals Mary Paul (Mary) and Matt Paul (Matt), to recover damages related to the alleged misappropriation of DT&C's intangible assets. The complaint alleged in salient part that, in 2015, Crown and DT&C entered into negotiations for Crown to purchase DT&C's intangible assets, including DT&C's customer lists with telephone numbers, "proprietary computer data," business trade names, and business telephone lines. During the negotiation and due diligence period, and in anticipation of the transaction, DT&C wound down its limousine business and turned over possession of its intangible assets to Crown. Crown then began to use DT&C's assets to solicit and service DT&C's customers, growing its business substantially. In the end, however, Crown did not purchase DT&C's intangible assets and refused to compensate DT&C for the benefit it gained by misappropriating those assets.

¶ 5    Matt moved to dismiss the complaint and Mary moved for judgment on the pleadings on Count 1 for conversion and Count 5 for violation of the Consumer Fraud and Deceptive Business Practices Act under section 2-615 of the Civil Practice Law. The circuit court issued an order stating that "Matt Paul and Mary Paul's 2-615 Motions to Dismiss are granted and *** Count[] 1 [for conversion] and [count] 5, are dismissed without prejudice and without leave to re-plead." The dismissal of Count 5 is not at issue in this appeal.

¶ 6    The case was tried to a jury. Matt testified as an adverse witness. He said that he and his wife Mary own Crown and that Mary was president of Crown in 2015. In 2015, Crown itself did not own any limousines or other vehicles directly, did not have employees, and did not have

automobile liability insurance. Crown owned "nothing." Crown's drivers were independent contractors, and Crown required each driver to operate through their own corporation, a common practice in the limousine industry. Crown had access to 90 limousines each day to serve its customers; 40 of them were owned by independent contractors, and the other 50 were owned by Crown's affiliated limited liability company, Southwest Chief. As compensation for their services, independent contractors were paid 70% of the fare that Crown charged its customers while Southwest Chief drivers were paid 40% of the fare.

¶ 7     Matt testified that most of Crown's business came from its own customers, but some came from "farm-out" customers, a common practice in the limousine industry in which one limousine company provides the customer and another limousine company "farms-in" or services that customer. The company that farms out the customer charges the customer directly and subsequently compensates the company that farms in the customer. However, at no time does the company that farms out its customer share its proprietary customer contact or billing information with the company that farms in the customer.

¶ 8     Matt met or spoke with Jansen, DT&C's principal, on approximately three occasions. On June 22, 2015, Jansen proposed a sale of DT&C's business to Crown. Matt told Jansen that he would have to "defer" to his attorneys and "let them decide" because of the possible liability stemming from overtime lawsuits pending against DT&C. Following that meeting, DT&C began farming-out some of its business to Crown and continued to do so through the first week of September 2015. Matt asserted that the farm-out and farm-in arrangement was consistent with previous farm-out arrangements where Crown would service DT&C customers, Crown would charge DT&C's credit card directly, and DT&C would not provide any proprietary customer contact information to Crown. Crown had enough drivers to serve both its own customers and

DT&C's customers. However, to service DT&C's farm-out requests, Crown had to pay extra phone charges because its call volume increased, and it may have had to pay its receptionists overtime to answer more calls.

¶ 9     Matt testified that during the month of July 2015, he had one phone call and one meeting with Jansen about the possible sale of DT&C's business to Crown. Matt acknowledged that Jansen and Bill Lynch, DT&C's other owner, briefly visited Crown's office. Matt, however, denied that he and Mary met with Jansen and Lynch in his office on July 23, 2015. Matt was then shown Plaintiff's Exhibit 21, an email exchange he had with Jansen on July 24, 2015, about the July 23, 2015, meeting. In the email, Jansen wrote, "Good morning Matt and Mary, We enjoyed getting together yesterday to discuss DT&C's as well as Crown's future in this crazy industry," and then outlined the proposal for Crown to acquire DT&C's assets. Matt responded via email that he could not comment on the proposal and had forwarded it to Crown's attorneys "to assess the risk potential." Matt denied the July 23, 2015, meeting ever occurred and claimed the email "was part of a setup." Matt testified that shortly after the July meetings with DT&C Mary decided she did not want to pursue the transaction.

¶ 10     Matt testified that Crown neither received nor used any of DT&C's intangible assets, including DT&C's trade names. Matt testified that DT&C had no trade names, denied that Crown ever received or used DT&C's telephone numbers, and denied that Crown ever received DT&C's customer lists or accessed DT&C's software to obtain customer information. The only Crown employee who ever accessed DT&C's software was Jerry Sterling, DT&C's former dispatcher, who Crown hired in mid-August 2015. Matt testified that after Crown hired Sterling, Sterling "continued to input orders on John Jansen's behalf into [DT&C's] Livery Coach [software] with

4

the laptop that Bill Lynch gave him" but that Crown never accessed DT&C's Livery Coach software.

¶ 11    In an August 3, 2015, email to Jansen, Matt stated that Mirage, which serviced customers primarily in the south suburbs of Chicago, "doesn't fit in our area of service" and that another company further south "might be able to better serve you on this than Crown." In the email, Matt also stated that Crown could not continue to use DT&C's "Town & Country" trade name "because of legal implications," although he admitted Crown was using the Town & Country name when servicing DT&C's farm-out business. Matt testified that by August 2015, DT&C was closing and no longer had any employees or drivers. He told Jansen in an email that "for me it is important that Crown gives the best possible service to DT&C customers for maximum retention." Matt denied that DT&C agreed to transfer its phone lines to Crown. However, when asked what he meant in his August 3, 2015, email when he said his plan was to separately track "all incoming calls" to Town & Country, Delaware, and Mirage "as they came" directly into Crown, Matt claimed that he "misspoke," and that it was "a poor choice of words."

¶ 12    Matt acknowledged that he had received and signed for a DT&C customer list, which he would have received if he acquired DT&C's assets but would not have received for farm-out services from DT&C.

¶ 13    On August 21, 2015, Matt sent an email to Jansen with the heading "New Town & Country Chicago." When asked what he meant by "New Town & Country Chicago," Matt testified "Nothing just, it didn't mean a thing." Matt denied "New Town & Country" had anything to do with Crown acquiring DT&C's Town & Country business tradename. In the same email, Matt said, "we want to start a marketing program for new websites etc. can you have your guy get in touch with Mike?" "Mike" was Mike Rezotko, Crown's information technology (IT) consultant.

When Matt was asked what he meant in this email, he stated: "I was trying to get a website created . . . and it's just me being nice and trying to help [Jansen] out[.]" After he was shown an exhibit with the website in question, Matt testified that he never completed the website and that he did not know if Jansen had ever approved it.

¶ 14    On September 1, 2015, Jansen sent Matt an email with the subject line: "Changing the Deal[.]" In his email response, Matt stated: "If you're so unhappy about things, why don't you take Jerry [Sterling, DT&C's former dispatcher] and pay Jerry and your phones and pay me for what you owe back and we will call it a day." When Matt was asked what he meant by "why don't you take . . . your phones" he claimed it was a "typo" and that he was talking about Jerry Sterling's "flip phone."

¶ 15    Matt also stated in the same email that Crown had acquired another limousine company, Keen Limousine, which had "raised their totals ever since years after years." When Matt was asked what he meant when he said it had "raised their totals" year after year, he explained: "I said we raised their totals because we did better with it because we were able to service all the customers better because I had more cars." Matt agreed that when Crown acquired another limousine company, he assumed he could increase the revenue from the acquired company's customers and that he "did it with Keen." In addition, Matt stated in the same email that DT&C's Livery Coach software "will at some point become non usable[.]" When he was asked why he was concerned about DT&C's software when he claimed Crown did not use it, Matt stated: "This particular email I was just furious. I'm pissed off, and I am screaming and yelling at him[.]"

¶ 16    Jerry Sterling (Sterling) testified that he began working as a limousine driver in 2005 at Town & Country, a company owned by Jansen that subsequently became part of DT&C. Sterling was hired as an employee, not an independent contractor, and received health care and other

benefits. A year after starting, Sterling became a dispatcher for the company and remained in that position for nine years. After Town & Country acquired Mirage and Delaware, the companies began "operating under" DT&C.

¶ 17    In August 2015, Sterling left DT&C and went to work for Crown. He left because DT&C had dismissed all of its drivers and the company had closed. Sterling understood that DT&C had been sold to Crown. In August, DT&C was farming-out 100% of its customer orders to Crown. Crown hired Sterling in August to be a dispatcher and to help Crown retain DT&C's customers. After he started working for Crown, someone at Crown gave him a list of DT&C's customers, including their phone numbers. Sterling testified that he used the list to call all DT&C customers and tried to keep them as Crown customers. Sterling understood that the customer list was a DT&C asset, and that Crown had acquired it.

¶ 18    Crown employed Sterling as a dispatcher for only five months, from August through December 2015. During that period, Crown used the identifier code "VIP" in Crown's software to identify DT&C's former customers. Sterling dispatched rides for former DT&C customers after September 1, 2015, and continued to dispatch rides for those customers until December 2015, when Matt told Sterling it was no longer economically viable for Crown to employ him, and he was terminated. Sterling then asked Matt if he could drive for Crown beginning in January 2016 and Matt agreed. Sterling had to form his own corporation to work as an independent contractor for Crown. He drove for Crown for six more years, from January 2016 through October 2022. During the entire six-year period, Sterling drove Crown customers who were former customers of DT&C.

¶ 19    Dewey Gosnell testified that he is an IT professional and runs the software applications support desk for Deloitte & Touche. Gosnell had worked as an IT professional and consultant since

1989. He met Jansen in 2005 and assisted his limousine business in administering its Livery Coach software. On July 30, 2015, either Lynch or Jansen asked him to assist Crown in obtaining access to DT&C's server to download data from DT&C's Livery Coach software. Gosnell went to DT&C's office, accessed its server, and set up a new username for Crown. This allowed Crown to remotely access DT&C's server from Crown's office and transfer data from DT&C's Livery Coach software to Crown's computers. On August 23, 2015, either Lynch or Jansen again called him after Crown could no longer access the DT&C server. Gosnell discovered someone had changed the username he had set up for Crown from "Crown" to CCL." Crown uses "CCL" as an abbreviation for "Crown Cars and Limousines" in its business logo on its website. Gosnell resolved the issue by setting up a "remote session" to ensure that Crown could continue to access the DT&C's server.

¶ 20    On August 24, 2015, Gosnell received a call from Lynch at DT&C. Lynch told him that "Mike [Rezotko] and Matt from Crown" wanted to speak with him about establishing a better connection between Crown's computer and DT&C's server. Gosnell visited DT&C's offices and met Rezotko, who he understood was Crown's IT consultant, and Matt, who he understood was Crown's owner. Rezotko and Matt told him that Crown's connection to the DT&C server was slow. Gosnell explained that "[w]hen you're connecting two servers across the internet, it can be slow, it could be tedious. Especially when you are moving large amounts of data." Gosnell further explained that Livery Coach had years of data and to transfer that amount of data "just dialing up to another computer is not really the best solution." Gosnell then discussed with Rezotko and Matt options to increase the speed of the data transfer, but nothing was resolved.

¶ 21    Mary testified as an adverse witness. She said that she is the president of Crown and had been since the 1990s. She oversees the billing and staff. Crown used the Voyager software to

process billing information and generate reports showing the dollar volume of business for each of Crown's customers. She testified that Crown has a small profit margin and that it did not generate any profits from DT&C's assets. Mary was shown Plaintiff's Exhibits 46, 47, and 48 and identified them as invoices Crown generated. Plaintiff's Exhibit 46 was an invoice dated March 3, 2016, with an account code of "T&C", which stands for Town & Country. Crown addressed the invoice to Town & Country at its office in Chicago. The invoice showed every customer trip Crown performed for Town & Country from July 30, 2015, through September 3, 2015, and the amount Crown charged DT&C for those trips. Mary testified, "Those are the trips they called into us for farm-ins that we performed for them." Crown billed $66,075 for the trips it serviced for Town & Country customers during that approximate one-month period. Mary next identified Plaintiff's Exhibit 47 as a similar invoice dated March 17, 2016, addressed to Delaware. It detailed every trip Crown serviced for Delaware customers on a farm-in basis from August 16, 2015, through September 4, 2015. Crown billed Delaware $24,712 for those trips. Finally, Mary identified Plaintiff's Exhibit 48 as an invoice Crown sent to Mirage dated March 21, 2016. This invoice was for the Mirage customers that were farmed-in to Crown during the 6-day period from August 15, 2015, through August 21, 2015. Crown billed Mirage $8,299 for those Mirage customer trips. Mary testified that she could not produce reports or invoices after September 1, 2015, because Crown lost the information when it switched to a new software program and the three reports Crown produced were the only ones that Crown could access.

¶ 22    Mary also testified that Crown was only farming-in DT&C customers. When Crown performed "farm-in" services, it did not need any information about DT&C's customers, including their address, billing or credit card information, or phone number. Because Crown was servicing DT&C's customers strictly on a farm-in basis, it did not need a print-out identifying all of DT&C's

customers or the amounts DT&C billed each customer during the prior year. Mary also testified that Crown would not need to create a website advertising Delaware. A limousine company that is farming-out business does not provide any information about its customers to the other limousine company because it does not want the other company to "poach" its customers.

¶ 23    Mary testified that she never had any discussions or attended any meetings about Crown's purchase of DT&C's assets. She never spoke to Jansen about an asset purchase, but told Lynch, "No it's not an option. We're only doing farm-ins. I made that very clear."

¶ 24    Finally, Mary denied that either she or Crown accessed or tried to access DT&C's Livery Coach software. She was then shown Plaintiff's Exhibit 35, a September 3, 2015, email chain beginning with an email from DT&C's remaining employee, Daiva, to Nate Kaye, Crown's general manager. In the email, Daiva asked, "Nate, could you please send all of the Delaware billing for 8/22/15. I am missing some." Mary, who was copied to the email, then responded to Daiva, writing: "We are having a problem getting into Livery Coach." When Mary was asked on cross examination whether Crown, which was only servicing DT&C's farm-out business, had access to DT&C's software, she answered: "Correct. He gave me permission, however, it never worked. The dial-in never worked. And that is why he called in his tech person, and it still never worked." Mary was then asked how DT&C's Livery Coach software was working today and she responded: "I don't have it anymore."

¶ 25    William Cazeau testified that he owns and operates Transport Limousine Services, Inc. (TLS), and that he has been in the limousine business on and off since 1992. TLS operates under three trade names: Mirage Limousine; Cozy Carriage Limousine; and U-Ride Limousine. Cazeau purchased Cozy Carriage from its prior owner. He began operating under the U-Ride trade name when the owner of that business passed away. In November 2015, after Cazeau had heard through

"industry chatter" that DT&C had ceased operations, he "took a shot" and called the phone company, learned that the phone number for Mirage was available, and started operating under the Mirage name using DT&C's Mirage phone number.

¶ 26    Shortly before November 2015, when Cazeau believed DT&C was still operating, he attempted to call Jansen at the Town & Country telephone number. Cazeau had known and done farm-out business with Jansen and Town & Country for many years. He had also done business with Crown. When he called the Town & Country phone number, Crown answered on behalf of Town & Country. Cazeau testified "he knew for a fact" that it was "Crown's people" answering the Town & Country phone and identified Crown's general manager Nate as the person who answered the phone and who he was familiar with. He explained that the first time he called the Town & Country number and Crown answered, he asked himself, "am I crazy, who am I calling." He called the number several more times, and Crown answered the phone each time.

¶ 27    Bill Lynch testified that he was a former DT&C president and a partner in DT&C's business. Lynch had known Jansen since the 1970s. He started working for him in 2000 and continued until 2015. He worked as a chauffeur, dispatcher, lead dispatcher, and eventually became president. Lynch has known Matt and Mary since 2000. He recalled attending two meetings with Matt and/or Mary in the summer of 2015. The first meeting was with Matt. The second was at Crown's office and was attended by Matt, Mary and Jansen.

¶ 28    Lynch testified that he delivered two documents to Matt, both of which had Lynch's handwriting and Matt's signature on the cover page. The first document, Plaintiff's Exhibit 27, was a forty-six-page DT&C sales report dated August 8, 2015, that included DT&C sales figures from August 2014 to July 2015. The second document, Plaintiff's Exhibit 26, was dated August 18, 2015, and contained a "Mirage All Pro price list and Fancy Free price list" and a "customer

list for Town & Country, Delaware and Mirage All Pro with [customer] names and addresses." Lynch also testified that in August 2015 no one at DT&C was answering the phones and that DT&C had transferred its phone lines to Crown.

¶ 29    John Jansen testified that he was DT&C's principal owner and founder. He testified that the most important assets of a limousine business are its intangibles, such as customer lists and information, business trade names, and business telephone numbers. In 2015, Jansen began to suffer from ill health and his business, which consumed 24 hours of every day of the year, was wearing him down. Between June and July 2015, he and Lynch met with Matt and Mary to discuss a potential purchase of DT&C by Crown. At the initial meeting in June 2015, Jansen, Lynch, and Matt discussed DT&C's customers, the rates charged to customers, and the profitability of the customers. Jansen had Matt sign a non-disclosure agreement but misplaced the signed copy and could only locate an unsigned copy. Matt expressed an interest in the purchase of the business and the discussions and exchange of information continued.

¶ 30    During the initial meeting and thereafter, Jansen explained to Matt that he and DT&C were named as defendants in two "overtime" lawsuits brought by former drivers and the Illinois Department of Labor. DT&C, unlike many limousine companies, employed its drivers and provided them with benefits. By contrast, most limousine companies, including Crown, did not employ their drivers; rather, drivers worked as "independent contractors" and were compensated based on a percentage of the fee charged to the customer and no benefits were provided. When Jansen started in the limousine business, limousine drivers, like taxi and truck drivers, were exempt from overtime laws. In 2013, the law changed unbeknownst to him, and limousine drivers became eligible for overtime. Jansen and DT&C were sued for unpaid overtime in 2015. These overtime claims were pending when Jansen discussed a potential sale of DT&C with Matt, and he disclosed

the pending litigation when he first met Matt. Matt expressed concern about potential "successor" liability if he proceeded with the purchase of DT&C's assets.

¶ 31    Following the initial meeting in June, Jansen and Matt exchanged additional information. Jansen provided Matt with a copy of DT&C's customer rate sheet. To demonstrate the quality and volume of DT&C's business, Jansen also began farming-out some of DT&C's customers to Crown.

¶ 32    On July 23, 2015, Jansen and Lynch met with Matt and Mary at Crown's office to discuss the sale and purchase transaction. During this meeting, Matt and Mary agreed to purchase some of DT&C's intangible assets, including customer lists and information, business trade names, and business telephone numbers. The following morning, Jansen emailed Matt and said, "Good Morning Matt & Mary, We enjoyed getting together yesterday to discuss DT&C's as well as Crown's future in this crazy business." Jansen then outlined the business terms of the transaction the parties had discussed. Matt responded to the email the same morning, writing, "John, Bill I can't comment yet but I sent to my attorneys already and want to be certain of my risk potential."

¶ 33    By August 2015, Jansen believed the parties had reached an agreement under which DT&C would sell its intangible assets to Crown, so Jansen began farming-out 100% of DT&C's customer orders to Crown and started transitioning DT&C's business to Crown. On August 3, 2015, in an email Matt sent to Jansen and Lynch, Matt discussed various issues about the transition of DT&C's business to Crown and requested that Crown be given access to DT&C's Livery Coach Software program to service DT&C's customers "in the same way they are accustomed to presently." Matt also promised that calls from DT&C's customers would "always [be] kept separate from my current existing companies" and that he would maintain DT&C phone numbers and lines for at

least two and a half years. Matt also agreed to hire DT&C's dispatcher, Sterling, who was responsible for scheduling and ensuring all customer orders were covered.

¶ 34    In mid-August 2015, Jansen became ill and stayed with a friend in Indiana while convalescing. Matt visited him in Indiana to discuss the transaction. Also in August 2015, Crown was provided a print-out identifying each of DT&C's customers as well as a second list showing the volume of business each customer generated. Matt acknowledged receipt of these documents by signing for them.

¶ 35    On August 21, 2015, Matt forwarded Jansen an email of the same date from Crown's computer consultant, Michael Rezotko, in which Rezotko asked Matt, "Can I get access to the Town & Country server? This way I can access the database and do some queries to create lists with contact info from the profiles." In Matt's forwarding email, Matt stated, "See below we want to start a marketing program for new websites etc. can you have you[r] guy get in contact with Mike [Rezotko]?" Jansen then had DT&C's computer consultant, Dewey Gosnell, contact Rezotko. Rezotko requested full access to DT&C's server housed at DT&C's office, which Gosnell granted.

¶ 36    On or around August 25, 2015, Crown also launched, without Jansen's knowledge or consent, a website advertising DT&C's most valuable trade name, "Delaware Cars & Limousines." Jansen testified that shortly before DT&C filed this lawsuit, he discovered the website by searching for "Delaware Cars & Limousines" on the internet. The home page on Crown's website advertised Delaware Cars & Limousines.

¶ 37    In late August 2015, DT&C transferred to Crown the phone numbers for its three brands, Town & Country, Delaware, and Mirage. After DT&C transferred the phone numbers, Crown answered all calls from customers for these three businesses.

¶ 38    Once in possession of DT&C's assets, Crown, Matt and Mary refused to pay for them. On September 1, 2015, while Jansen was ill in Indiana, he learned from Lynch that Matt wanted to change the payment terms of the deal. Jansen then sent Matt an email, stating that he was unwilling to change the terms of the deal. Matt responded in an email the same day, in which he conceded that Crown already had control of DT&C's business phone numbers, software, and customers.

¶ 39    Following this email exchange, Jansen called Matt and demanded the return of his property. When Matt refused, Jansen told him he would stop making payments to Crown for the customer trips DT&C had farmed-out to Crown as a way to recoup the money Crown owed DT&C for the assets it had misappropriated. Jansen explained that he had farmed-out DT&C customer orders to Crown and allowed Crown to take possession of DT&C's intangible assets because he understood and believed that Crown was acting in good faith and intended to purchase DT&C's assets. In a September 4, 2015, email, Matt threatened to sue Jansen and go to the police and Federal Bureau of Investigation if Jansen stopped the payments. Matt also said that he would "spare no expense or amount of resources in hunting down every last brick that you own tying them up in court – you will not be able to sell anything till your case is resolved with us."

¶ 40    Before trial, DT&C disclosed Michael Pakter as its Illinois Supreme Court Rule 213(f)(3) expert witness, who would opine that Crown realized $3,401,900 in additional net revenue after compensating its drivers as a result of the Crown's misappropriation and conversion of DT&C's intangible assets. DT&C's disclosure stated that Pakter's opinion was based on:

"[1] The August 2015 revenues of Town and Country (Plaintiff's Exhibit 46)

[2] The August 2015 revenues of Delaware (Plaintiff's Exhibit 47)

[3] The August 2015 revenues of Mirage (Plaintiff's Exhibit 48)

[4] The 54-month period from September 1, 2015 (beginning of Defendants' conversion of Plaintiffs' business assets to February 28, 2020 (prior to the beginning of the COVID-19 pandemic).

[5] The assumption that Crown operated a total of 90 cars in its business.

[6] The assumption that of those 90 cars 50 cars were owned by a Crown affiliate and operated by independent contractors and 40 cars were owner operated.

[7] The assumption that fares earned on trips would be allocated 40% to drivers who drove Crown cars and 70% to owner operators and the balance was paid to Crown.

[8] The assumption that 50/90 of cars or 56% were owned by a Crown affiliate.

[9] The assumption that 60% of revenues from Crown affiliates was revenue to Crown.

[10] The assumption that 40/90 of cars or 44% were owner operated.

[11] The assumption that 30% of revenues from owner-operators was revenue to Crown.

[12] The assumption that Crown incurred no additional overhead in providing services to the Town and Country, Delaware, and Mirage customers it obtained through the conversion of DT&C's assets.

[13] The assumption that applying the above assumptions to the revenue of Town and Country, Delaware, and Mirage is a reasonable proxy that measures the benefit Crown realized from the conversion of DT&C's business assets."

Pakter's opinion of damages is sometimes characterized as net profit and sometimes as net revenue. Regardless of which term is used, Pakter's damage figure represents Crown's profit from servicing DT&C's former customers.

¶ 41    Crown moved to bar Pakter from testifying as an expert at trial. Before deciding whether to bar him, the circuit court ordered a *voir dire* outside of the presence of the jury regarding Pakter's

opinions. Counsel for Crown and DT&C, as well as the court, asked Pakter questions about the bases for his opinions.

¶ 42     Pakter testified that he is a licensed accountant and certified fraud examiner holding multiple professional certificates and has testified at dozens of trials as an expert witness on economic damages. Pakter testified that his opinion here was based upon DT&C's invoices to Crown for the months of July through September 2015 and on information relayed to him orally by DT&C's counsel. He made clear that he was not engaged to determine DT&C's lost profits. He acknowledged that when considering DT&C's customers, he did not differentiate between DT&C's own customers and those farmed-in to DT&C from other limousine companies, and he admitted that he had no knowledge of which were DT&C's customers and which were farmed-in to DT&C. His opinion was not based on the same individual passengers continuing to use Crown's services, but rather upon a general assumption that the volume of passengers Crown farmed-in from DT&C between July through September would remain constant in the future. In addition, Pakter stated that he relied on DT&C's counsel's representations about what Matt testified to in his deposition to determine the revenue Crown actually earned and admitted that he did not personally review Matt's deposition transcript.

¶ 43     The circuit court barred Pakter from testifying. It reasoned that: (1) DT&C's counsel provided Pakter with some of the information that formed the basis for his opinion and thus his assumptions were not independently confirmed from depositions or other sources; (2) Pakter was not aware that DT&C had not re-registered the business trade names Town & Country Limousines and Delaware Limousines; (3) Pakter was not completely aware of the telephone line transfers from DT&C to Crown and Crown's use of DT&C telephone lines; (4) Pakter did not distinguish between DT&C's customers and passengers serviced by DT&C and Crown; and (5) Pakter

projected out revenue and profit 54 months into the future based on earnings over a period of only three months.

¶ 44    The jury found in favor of DT&C on the unjust enrichment count, awarding $42,500 in damages, and in favor of Crown on the conversion count. DT&C filed a motion for new trial, which the circuit court denied. DT&C timely appealed.

¶ 45                                II. ANALYSIS

¶ 46    DT&C appeals (a) the circuit court's denial of its motion for new trial on damages, where DT&C argued that the circuit court improperly barred its expert witness on damages; (b) the sufficiency of the jury's damages award; (c) the jury's finding in favor of Crown on the conversion claim; and (d) the circuit court's dismissal of the sole count for conversion against Matt and Mary in their individual capacities. We address each ground for appeal in turn.

¶ 47    A. The Circuit Court Erred in Denying DT&C's Motion for New Trial on Damages

¶ 48    DT&C argues that the circuit court abused its discretion in denying its motion for a new trial because it improperly barred its expert witness on damages. A reviewing court may not set aside a ruling on a motion for new trial unless the circuit court abused its discretion. *Cimino v. Sublette,* 2015 IL App (1st) 133373, ¶ 102. An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. *Id.* If the circuit court's decision rests on an error of law, then it is clear an abuse of discretion occurred. *Moore v. Mandell*, 2023 IL App (5th) 220289, ¶ 34.

¶ 49        i. The Circuit Court Erred in Barring DT&C's Expert Witness on Damages

¶ 50    In an unjust enrichment claim, restitution is a form of damages measured by the defendant's gain. *Toushin v. Ruggiero*, 2021 IL App (1st) 92171, ¶107. DT&C argues that the circuit court erred in barring its expert witness on damages, Michael Pakter, who was prepared to quantify

Crown's gains from its misappropriation of DT&C's intangible assets. DT&C contends that the jury's decision to award damages equivalent to only one month of profits made no sense where Crown used DT&C's intangible assets to generate substantial revenue and profit for years without compensation. If Pakter had been allowed to testify, "his testimony *** would have aided the jury in determining the restitution Crown should have made to DT&C under its unjust enrichment claim." DT&C further contends that the circuit court's reasons for barring Pakter were flawed as a matter or law or because they went to the weight, not the admissibility, of his testimony. Crown responds that the circuit court properly barred Pakter's testimony because it was based on conjecture and lacked a sufficient factual basis.

¶ 51    Illinois Supreme Court Rule 702, which governs the admissibility of expert testimony, provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Sept. 14, 2018). The circuit court has a two-fold gatekeeping function: (1) to determine if the individual is qualified as an expert; and (2) to determine whether the expert's testimony would assist the trier of fact. *Thompson v. Gordon*, 356 Ill. App. 3d 447, 460 (2005).

¶ 52    Here, the circuit court expressly acknowledged that Pakter, a certified public accountant and fraud examiner, was "most qualified" to offer expert testimony. Therefore, we turn to the remaining question of whether Pakter's testimony would have assisted the trier of fact in determining unjust enrichment damages. Crown only produced pertinent financial records for the months of July, August, and September 2015. Consistent with the evidence, Pakter assumed that, aside from driver compensation, Crown did not incur any further costs or expenses to service

19

DT&C's former customers. To calculate Crown's profits from DT&C's customers, Pakter started with the total billings reflected in Crown's 2015 invoices for DT&C's customers that had previously been serviced by Town and Country, Delaware and Mirage. Because the amount of the customer fare that Crown retained as profit was dependent on who drove the passenger, Pakter then determined the approximate percentage of rides that would have been serviced by Southwest Chief and Crown's independent drivers. Then he calculated the amount of Crown's net revenue, sometimes referred to as profit, from servicing DT&C's former customers under each of DT&C's three business trade names. He then added the figures together to arrive at Crown's gain.

¶ 53    "[E]xpert testimony is admissible where helpful to comprehension or explanation." *Thacker v. UNR Industries, Inc.,* 151 Ill. 2d 343, 365 (1992). Here, while the jury could have independently examined the financial records Crown produced for July, August, and September, 2015, an average lay juror with no expertise in accounting would not necessarily know how to calculate Crown's profit from DT&C's customers for those months, or how to extrapolate from those figures Crown's profits beyond 2015. For example, because of their different compensation rates, Pakter explained that in determining the amount of expenses to deduct from Crown's additional revenue from servicing DT&C's customers it was necessary to ascertain the percentage of DT&C passengers that were serviced by Southwest Chief drivers and the percentage that were serviced by independent contractor drivers. In other words, Pakter's testimony would have assisted the jury to determine what percentage of Crown's incremental revenue from servicing DT&C's customers would be paid to the limousine drivers and what percentage would be retained by Crown. In the absence of any meaningful evidence of additional expenses incurred by Crown, these calculations were central in determining the profit realized by Crown from DT&C's

customers. Thus, Pakter's testimony would have assisted the jury in understanding how to determine damages based on Crown's raw financial data.

¶ 54    The circuit court did not question the basic methodology Pakter employed to calculate the profit realized by Crown; instead, the court barred Pakter's testimony because it found that his opinion lacked sufficient bases and was speculative. But the basis for an expert witness's opinion does not generally affect the expert's standing as an expert or the sufficiency of the opinion. *Snelson v. Kamn*, 204 Ill. 2d 1, 26-27 (2003). Instead, the basis for the expert's opinion goes only to the weight of the evidence. *Id.* The burden is on the adverse party during cross examination to elicit facts underlying the expert's opinion (*Wilson v. Clark*, 84 Ill. 2 186, 194 (1981)), to uncover weaknesses in the basis for an expert's opinions, and to challenge the sufficiency of his assumptions and the soundness of his opinion. *Karn v. Aspen Commercial Painting*, 2019 IL App (1st) 173194, ¶16 (2019). For example, in *National Bank of Monticello v. Doss*, the appellate court affirmed the circuit court's decision to allow an expert witness to testify despite the expert witness's "failure to consider tax consequences in calculating his figures" because any flaw in methodology only "went to the weight of the evidence, not its sufficiency." 141 Ill. App. 3d 1065, 1072-73 (1981). The jury's decision to award damages that were less than what the expert calculated showed that it disregarded parts of the expert's opinion. *Id.*

¶ 55    Here, we find that the circuit court abused its discretion when it barred Pakter from testifying about DT&C's damages because its reasons for excluding his testimony went to the weight to be given his testimony, not its admissibility, or were erroneous as a matter of law. Had Pakter had been permitted to testify, Crown could have cross examined him on the basis for his opinions, and the jury could have accepted as much or as little of Pakter's testimony as it wanted. By disallowing Pakter's expert testimony in its entirety, the circuit court went beyond its

gatekeeping function and invaded the province of the jury. As we explain below, the circuit court committed several errors of law and otherwise abused its discretion when it barred Pakter from testifying

¶ 56    We disagree with the circuit court's conclusion that Pakter's opinions lacked a sufficient factual basis because they were based on Crown's earnings over a brief period of time. Relying essentially on Crown's July, August and September, 2015 earnings from DT&C's former customers, Pakter projected Crown's earnings for the 54-month period thereafter. But he was forced to do so because Crown failed to produce any pertinent records for the period after September 2015, claiming it lacked access to the necessary software. Pakter's opinions cannot be deemed lacking in basis when he utilized the pertinent records that Crown produced but was then impeded by Crown's failure to produce additional pertinent records that would have permitted him to more precisely calculate damages. The reasoning in *Dering v. Services Experts Alliance LLC*, 2007 WL 4299968, *7 (N.D. Georgia), is persuasive. There, the defendants challenged the plaintiff's expert witness's damage calculation as unreliable for assuming that a business acquiring another business would capture 100% of the acquired business's revenue. However, the defendant "failed to provide Plaintiffs with any information that might aid [the expert] in calculating the percentage of business revenue that [the acquiring business] would have captured[.]" Rejecting the defendant's argument, the court reasoned:

> "If Plaintiffs' expert has failed to make calculations with the highest precision, then the blame clearly lies with Defendants. Their failure to keep records and their reluctance to provide Plaintiffs with relevant information made a perfectly precise calculation of damages impossible. Defendants cannot now complain that this supposed deficiency renders [the expert witness's] calculations inadmissible." *Id.*

22

The same is true here. Although Crown claims it does not have financial records for the DT&C customers it served after September 2015, it does not dispute that it serviced those DT&C customers through October 2022. Had Crown maintained access to its records and produced them to DT&C, Pakter's calculations would have been more precise. Crown may not take advantage of its own failure to maintain access to its records to argue that Pakter's opinions lack a sufficient factual basis.

¶ 57    Nor do we agree with the circuit court that Pakter's opinions were speculative. Damages are considered speculative "only if their existence itself is uncertain, not if the amount is uncertain or yet to be fully determined." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 307 (2005) "To allow defendants to escape liability because the amount of damages they have caused is uncertain would immunize the defendants from the consequences of their wrongful conduct." *Westlake Financial Group, Inc.*, 2015 Ill. App (2d) 140589, ¶ 51. Here, Crown does not dispute that it serviced DT&C's former customers until at least October 2022. Thus, the existence of DT&C's damages itself is not uncertain. To be sure, the jury also found that DT&C suffered damages.

¶ 58    The circuit court also barred Pakter from testifying because DT&C's counsel provided Pakter with the facts that served as the bases for his opinion when he told Pakter what Matt testified to in his deposition. Illinois Rule of Evidence 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703.

The Federal Advisory Committee's Note to Federal Rule 703, which our Supreme Court adopted, makes clear that one of the sources of facts or data contemplated by the rule "consists of presentation of data to the expert outside of court and other than by his own perception." Fed. R. Evid. 703, Federal Advisory Committee's Note. See also *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 92 (expert may rely on hearsay evidence as long as experts in that field would reasonably rely on such information). In addition, Illinois Rule of Evidence 705 states:

> "The expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Ill. R. Evid. 705.

Here, Pakter relied on DT&C's counsel for the substance of Matt's deposition testimony and Crown does not suggest that either DT&C's counsel or Pakter misstated or misunderstood Matt's deposition testimony. If the facts that DT&C's counsel conveyed to Pakter about the substance of Matt's deposition testimony were not accurate, then Crown was free to press Pakter on that in cross examination. In any case, Matt's testimony at trial confirmed the facts that Pakter relied on to reach his conclusions. Crown has not cited any authority that requires an expert to personally read the deposition transcript of a fact witness. Thus, DT&C's counsel's role in providing Pakter with the facts that he ultimately relied on before trial to form his opinions was not a proper basis to bar Pakter's testimony.

¶ 59    The circuit court also excluded Pakter's testimony because he was unaware that DT&C had not re-registered the business trade names Town & Country Limousines and Delaware Limousines. But the failure to re-register does not render DT&C's trademarks without value. See *Mars, Inc. v. Curtiss Candy Co.*, 8 Ill. App. 3d 338, 343 (1972) (the registration of a trademark

does not establish a right that would not otherwise exist). While the registration status of the trademark may affect the damages calculation, it is within the purview of the trier of fact to determine the weight of the expert's opinion in light of facts the expert may or may not have considered. *Snelson*, 204 Ill. 2d at 26-27. Crown was free to cross examine Pakter about the factual basis of his opinion, and any lack of knowledge of the relevant facts on Pakter's part went only to the weight to be given to his testimony, not its admissibility.

¶ 60       The circuit court also barred Pakter's testimony because of his lack of or limited knowledge of the business telephone lines that were transferred from DT&C to Crown. The circuit court's concern, as far as we can tell, was that the business telephone line for Mirage was appropriated by another entity and it was unclear whether the Town & County and Delaware business telephone numbers remained with Crown. But this too is not a sufficient basis to bar Pakter from testifying. Whether the business telephone lines remained with Crown and for how long goes to the weight to be given Pakter's opinion, which is a question for the jury. Although there was testimony that Mirage's telephone lines were assumed by another entity, there was also evidence that Crown provided services for customers that called the Mirage telephone number. To the extent the evidence did not support Pakter's assumption that Crown used Mirage's business telephone lines for the entire 54-month period over which he calculated damages, the jury was free to reject Pakter's conclusion that DT&C should be compensated for Crown's use of Mirage's business telephone lines for that entire time and determine for itself the appropriate time period.

¶ 61       The circuit court also barred Pakter's testimony because, in calculating Crown's revenues from servicing DT&C's former customers, he failed to distinguish between DT&C customers and those farmed-in to DT&C from other companies. However, Pakter based his opinion on Crown's invoices, which did not distinguish between DT&C's customers and those farmed-in to DT&C.

Crown was free to cross examine Pakter on this point to cast doubt on his projection figures and challenge the weight to be given his testimony. However, Pakter's decision not to distinguish between Crown's different types of customers is not a basis to bar him from testifying.

¶ 62    Finally, the circuit court briefly expressed concern that Pakter's projection of damages for a 54-month period was not supported by the evidence. Again, it was within the purview of the jury to accept or reject Pakter's projections. More importantly, the circuit court erred in finding that Pakter's projections were not supported by the evidence. Sterling, who used to work for DT&C but then went to work for Crown after DT&C wound down its operations, testified he provided services for former DT&C customers until he left Crown in October of 2022. Pakter's 54-month projection period commenced when Crown obtained DT&C's intangible assets in July 2015 and ended in February 2020, when the coronavirus pandemic disrupted the limousine industry and Crown's business declined.

¶ 63    We conclude that the circuit court abused its discretion in barring Pakter from testifying at trial as DT&C's expert witness on damages.

¶ 64    ii. DT&C is Entitled to a New Trial, Limited to Unjust Enrichment Damages.

¶ 65    A circuit court may order a new trial for damages only when the damages award is manifestly inadequate, it is clear that proved elements of damages have been ignored, or the amount of the award bears no reasonable relationship to the loss suffered. *Cimino v. Sublette,* 2015 IL App (1st) 133373, ¶ 102. Based on our conclusion that the circuit court erred in barring DT&C's expert witness on damages, we agree with DT&C that the circuit court also erred in denying DT&C's motion for a new trial limited to damages. The damages award here was manifestly inadequate because the jury only awarded damages equivalent to one month of Crown's profits

when Crown continued to use DT&C's intangible assets to generate substantial profits for a period of years.

¶ 66    Crown, however, argues that if the court orders a new trial, then it should be on both liability and damages. A new trial limited to damages may be ordered only where: (1) the jury's verdict on liability is amply supported by evidence; (2) the questions of liability and damages are so separate and distinct that a trial limited to damages is not unfair to the defendants; and (3) the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error that resulted in the inadequate damages also affected the finding of liability. *Merrill v. Hill*, 335 Ill. App. 3d 1001, 1006-07 (2002).

¶ 67    To be found liable for unjust enrichment, the defendant must have unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience. *Stefanski v. City of Chicago*, 2015 IL App (1st) 132844, ¶ 47. Here, the jury's verdict on the unjust enrichment count was amply supported by the evidence, which established that Crown retained the benefit of DT&C's intangible assets without compensating DT&C and that Crown's retention of that benefit violates fundamental principles of justice, equity, and good conscience. The evidence established that Crown solicited and provided services to DT&C's former customers for years after DT&C first farmed-out its customers to Crown during the negotiation and due diligence period of the sale and purchase transaction; DT&C's business telephone lines were redirected to Crown's dispatchers; Crown used DT&C's Livery Coach software to solicit and service DT&C's customers; Crown used DT&C's business tradenames on its website; and Crown did not compensate DT&C for using its intangible assets. We also find that the questions of liability and damages are so separate and distinct that a new trial limited to damages would not be unfair to Crown. Pakter's damages

assessment was based on financial data in the limited records that Crown produced and Matt's deposition testimony regarding Crown's compensation arrangement for its drivers. Crown has not identified any aspect of DT&C's damages that turn on whether it was liable to DT&C for unjust enrichment. Finally, nothing in the record suggests that the jury's verdict represented a compromise or that the circuit court's error in barring Pakter from testifying on damages affected the jury's verdict on liability. Therefore, we find that the court erred in denying DT&C's motion for new trial on the issue of damages, and remand for a new trial for that purpose only.

¶ 68                                iii. Conversion Verdict

¶ 69    DT&C next argues that the jury's verdict was inconsistent because it found in DT&C's favor on the unjust enrichment claim but in Crown's favor on the conversion claim. Specifically, DT&C contends that "[b]ecause the jury found that Crown was unjustly enriched by possessing and using DT&C's assets to solicit DT&C customers and then found that Crown did not have possession and control of the same assets [for purposes of the conversion count], the verdict *** is legally inconsistent[.]"

¶ 70    A verdict is legally inconsistent when the same element is found to both exist and not exist. *McCarthy v. Union Pac. R.R. Co.*, 2022 IL App (5th) 200377, ¶102. Again, to prove unjust enrichment a plaintiff must establish that (1) the defendant unjustly retained a benefit to the plaintiff's detriment, and (2) the defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience. *Stefanski v. City of Chicago*, 2015 IL App (1st) 132844, ¶ 47. To prove conversion, a plaintiff must establish: 1) its right to the assets; 2) its absolute and unconditional right to the immediate possession of the assets; 3) that defendant wrongfully and without authorization assumed control, dominion, or ownership over the assets,

and 4) that plaintiff made demand for return of the assets. See *Weisberger v. Weisberger*, 2011 IL App (1st) 101557 ¶ 45.

¶ 71    The jury's verdict in favor of DT&C on the unjust enrichment claim is not inconsistent with its verdict in favor of Crown on the conversion claim. Question 4 on the verdict form for the conversion count states: "Did DT&C prove Crown wrongfully and without authorization assume[d] control, dominion, or ownership over DT&C's assets?" The jury checked "No[.]" The evidence at trial established that DT&C voluntarily farmed-out its customers to Crown and voluntarily provided customer information and other intangible assets beyond what would ordinarily be provided when one company farms-out its customers to another company. In contrast, the elements of unjust enrichment are more general and a plaintiff is not specifically required to establish that the defendant obtained control over the plaintiff's property without authorization. The evidence supported both the jury's finding that Crown had unjustly retained a benefit for which DT&C should be compensated as a matter of equity and fairness, and that DT&C gave Crown permission to use its intangible assets during the period that DT&C and Crown negotiated for the sale and purchase of DT&C's intangible assets. Because an element of conversion is that Crown assumed control, dominion, or ownership over DT&C's assets without authorization, the jury did not find an element to both exist and not exist. Therefore, there are no inconsistencies in the jury's verdicts on the unjust enrichment and conversion counts.

¶ 72              B. Claims Against Matt and Mary in Their Individual Capacities

¶ 73    Finally, DT&C argues that the circuit court erred in dismissing the conversion claim against Matt and entering judgment on the pleadings in favor of Mary on the conversion claim. We review motions to dismiss under section 2-615 of the Civil Practice Law *de novo*. *O'Connell v. County of Cook*, 2022 IL 127527, ¶ 19. A section 2-615 motion to dismiss assesses the legal

sufficiency of a complaint. *Id.* at ¶ 18. We accept as true all well-pleaded facts and all reasonable inferences and construe the allegations in the light most favorable to the plaintiff. *Id.* Likewise, we review a section 2-615(e) motion for judgment on the pleadings *de novo. Bennett v. Chicago Title and Trust Co.*, 404 Ill. App. 3d 1098, 1074 (2010). A section 2-615(e) motion for judgment on the pleadings is proper where the pleadings disclose no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.*

¶ 74      DT&C brought suit against Crown and against Matt and Mary in their individual capacities, as agent and officer of DT&C, respectively. The circuit court issued an order stating that "Matt Paul and Mary Paul's 2-615 Motions to Dismiss are granted and *** Counts 1 and 5, are dismissed without prejudice and without leave to re-plead." The court left open the possibility that additional facts may come to light in discovery and that DT&C could amend its complaint to state a conversion claim against Matt and Mary individually. Indeed, shortly prior to the commencement of trial, DT&C sought leave to do so, but the circuit court denied the motion, leaving the dismissal in place. While DT&C included the order denying the motion for leave to amend in its notice of appeal, it did not make any arguments pertaining to that order in its brief. Points not argued are forfeited (Ill. Sup. Ct. R. 341(h)(7)), so we will not consider whether the motion for leave to amend was improperly denied.

¶ 75      If seeking to impose individual liability on an officer or agent of a corporation that was alleged to have converted assets, the plaintiff must also prove that the officer or agent actively participated in the conversion. *IOS Capital, Inc. v. Phoenix Printing, Inc.*, 348 Ill. App. 3d 366, 371 (2004). Though corporate officers are not generally liable for corporate obligations, "they are liable for any tort of the corporation in which they participate." *Id.* (citing *Landfield Finance Co. v. Regal Paper Box Co.*, 345 Ill. App. 611 (1952). Any participation in the conversion does not

necessarily translate to individual liability; instead, liability attaches to individuals only when they are "alleged to have taken part in the wrongful act *initially giving rise to the corporation's liability*." *Id.* (emphasis in original).

¶ 76    Any error by the circuit court in dismissing the conversion count against Matt and Mary does not warrant reversal where the jury found that Crown did not convert DT&C's assets. *See Greenfield v. Consolidated Rail Corp.*, 150 Ill. App. 3d 331, 339 (1986) ("We find dismissal of plaintiff's count * * *, if error, was harmless, because the theory of liability alleged in the dismissed count was presented in the other counts. It has been held that '[w]here a party's pleading is struck, there is no prejudice to that party where evidence is taken, and a finding is made on the same matters alleged in the pleading.' "). Here, without a finding that Crown converted DT&C's assets, Matt and Mary could not have been found liable for conversion as agent or officer of Crown either. The conversion claim against Matt, Mary, and DT&C was premised on the same allegations and there was no allegation that Matt or Mary took any action to convert DT&C's assets independent of their roles as agent and officer of Crown. The jury here found, and the evidence supports, that Crown did not "wrongfully and without authorization assume control, dominion, or ownership over DT&C's assets" because DT&C allowed Crown to assume control of the assets. For Matt and Mary to be found liable for conversion they must have participated in Crown's conversion. Thus, to allow DT&C to now pursue its conversion claim against Matt and Mary would be inconsistent with the jury's verdict in favor of Crown on the conversion claim. Accordingly, we affirm the court's dismissal of the conversion count against Matt and Mary.

¶ 77                                III. CONCLUSION

¶ 78    We reverse the circuit court's decision to bar DT&C's expert witness on damages and its decision to deny DT&C a new trial limited to damages. We affirm the jury's verdict in favor of

Crown and against DT&C on the conversion count and, accordingly, also affirm the dismissal of Mary and Matt from the conversion count. We remand for further proceedings consistent with this decision.

¶ 79    Reversed in part, affirmed in part, and remanded for a new trial limited to damages.

¶ 80    JUSTICE HYMAN, specially concurring:

¶ 81        The majority acknowledges the established principle that, while corporate officers are generally not liable for corporate obligations, they can be held accountable "for any tort of the corporation in which they participate." *IOS Capital, Inc. v. Phoenix Printing, Inc.*, 348 Ill. App. 3d 366, 371 (2004)." *Supra* ¶ 75. *IOS Capital* also states that participation in a tort attaches to individuals only if they are "alleged to have taken part in the wrongful act *initially giving rise to the corporation's liability*." *IOS Capital, Inc.*, 348 Ill. App. 3d at 371 (emphasis in original). From this, the majority concludes that Matt and Mary cannot be found liable for conversion because the jury determined that Crown was not liable. I disagree with the majority's reasoning.

¶ 82        "[W]hile corporate status generally shields corporate officers and shareholders from liability from corporate debts and obligations, this protection does not shield corporate officers from their own tortious acts." *Safeway Insurance Co. v. Daddono*, 334 Ill. App. 3d 215, 219 (2002); see also *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 959 (7th Cir. 1999) (holding if officer commits act outside scope of official duties, employer may not be liable, but officer can be liable, whether or not act within that scope). Corporate officers may be found liable for torts they participated in, although the corporation is found not liable. *Id.*; see also *National Acceptance Co. of America v. Pintura Corp.*, 94 Ill. App. 3d 703, 707 (1981) (corporate officer's status does not shield from liability for tortious acts from which breach

proximately resulted). Thus, despite the result at trial, Matt and Mary could have been found individually liable for conversion.

¶ 83        As the majority notes, DT&C's complaint failed to allege Matt and Mary individually took action to convert DT&C's assets independent of their roles as agents and officers of Crown. *Supra* ¶ 74. The trial court denied DT&C leave to amend its complaint to add individual conversion claims against Matt and Mary. By failing to raise the issue on appeal, DT&C forfeited it. But had the complaint been amended, DT&C could have alleged Matt and Mary were individually liable for conversion and prejudiced by the dismissal, regardless of the jury's verdict.